## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

DALE CARTER, on behalf of himself and all others similarly situated,

      Plaintiff,

v.

UQM TECHNOLOGIES, INC.
DONALD W. VANLANDINGHAM,
JOE MITCHELL,
STEPHEN J. ROY,
JOSEPH P. SELLINGER, and
JOHN E. SZTYKIEL

      Defendants.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

---

Plaintiff Dale Carter ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, files this action against the defendants and alleges upon information and belief, except for those allegations that pertain to him, which are alleged upon personal knowledge, as follows:

### SUMMARY OF THE ACTION

1.    Plaintiff brings this stockholder class action on behalf of himself and all other public stockholders of UQM Technologies, Inc. ("UQM" or the "Company") against UQM and its Board of Directors (the "Board" or the "Individual Defendants," collectively with UQM, the "Defendants") for violations of Sections 14(a) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act") and for breaches of fiduciary duty as a result of Defendants' efforts to sell the Company to affiliates of Denmark-based Danfoss A/S, including Danfoss Power Solutions

(US) Company (the "Parent") and Danfoss-2019 Merger Sub, Inc. (the "Merger Sub," collectively with Danfoss A/S and Parent, "Danfoss") in a proposed all cash transaction valued at approximately $100 million (the "Proposed Transaction").

2.      The terms of the Proposed Transaction were memorialized in a January 22, 2019, filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").   Under the terms of the Merger Agreement, UQM will become an indirect wholly-owned subsidiary of Danfoss, and Danfoss stockholders will receive $1.71 in cash for each share of UQM common stock they own.

3.      Thereafter, on February 12, 2019, UQM filed a Preliminary Proxy Statement on Schedule PREM14A (the "Preliminary Proxy") with the SEC in support of the Proposed Transaction.

4.      Notably, the Preliminary Proxy reveals that the Proposed Transaction represents the culmination of efforts by the Company Board, management and other insiders to effectuate a sale of the Company, by any means necessary.   In fact, this goal has been pursued by the Board with such single-mindedness that it has necessarily caused UQM to waste substantial sums in two previous failed attempts at a sale of the Company – one of which was voted down by UQM stockholders.

5.      Despite the clear signal from UQM stockholders in shutting down previous efforts to sell the Company, the Company Board has forged ahead nonetheless, effectuating the Proposed Transaction and causing irreparable injury to Plaintiff and the Class.

6.      In approving the Proposed Transaction, the Individual Defendants have breached their fiduciary duties of loyalty, good faith, due care and disclosure by, *inter alia*, (i) agreeing to sell UQM without first taking steps to ensure that Plaintiff and Class members (defined below)

would obtain adequate, fair and maximum consideration under the circumstances; and (ii) engineering the Proposed Transaction to benefit themselves and/or Danfoss without regard for UQM's public stockholders. Accordingly, this action seeks to enjoin the upcoming stockholder vote on the Proposed Transaction and compel the Individual Defendants to properly exercise their fiduciary duties to UQM's stockholders.

7. Furthermore, the Individual Defendants, as defined herein, have exacerbated their breaches of express and implied contractual duties and fiduciary duty by agreeing to lock up the Merger with preclusive and onerous deal protection devices that preclude other bidders from making successful competing offers for the Company and act to render the Merger a fait accompli. For example, the Board agreed to: (i) a "no solicitation" provision that prevents the Company from negotiating with or providing confidential information to competing bidders except under extremely limited circumstances; (ii) a "matching rights" provision that allows Platinum to match any competing proposal in the unlikely event that one emerges; and (iii) up to $3,500,000 in termination fees and expenses if the Board agrees to a competing proposal.

8. Next, it appears as though the Board has entered into the Proposed Transaction to procure for themselves and senior management of the Company significant and immediate benefits with no thought to the Company's public stockholders. For instance, pursuant to the terms of the Merger Agreement, upon the consummation of the Proposed Transaction, Company Board Members and executive officers will be able to exchange all Company equity awards for the merger consideration. Moreover, certain Directors and other insiders will also be the recipients of lucrative change-in-control agreements, triggered upon the termination of their employment as a consequence of the consummation of the Proposed Transaction.

9.      In further violation of their fiduciary duties, Defendants caused to be filed the materially deficient and/or materially misleading Preliminary Proxy on February 12, 2019 with SEC in an effort to solicit stockholders to vote their UQM shares in favor of the Proposed Transaction.  The Preliminary Proxy is materially deficient and/or materially misleading and deprives UQM stockholders of the information they need to make an intelligent, informed and rational decision of whether to vote their shares in favor of the Proposed Transaction.  As detailed below, the Preliminary Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process and in particular certain conflicts of interest for management; (b) the financial projections for UQM, provided by UQM to the Company's financial advisor Duff & Phelps, LLC ("Duff & Phelps") for use in its financial analyses; (c) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisor, Duff & Phelps.

10.      Consequently, the Individual Defendants have breached their fiduciary duties of loyalty and due care.

11.      Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the unreasonable steps taken by the Defendants in entering into the merger agreement without attempting to maximize stockholder value.  Immediate judicial intervention is warranted here to rectify existing and future irreparable harm to the Company's stockholders.  Plaintiff, on behalf of the Class, seeks only to level the playing field and to ensure that if stockholders are to be ultimately stripped of their respective equity interests through the Proposed Transaction, that the Proposed Transaction is conducted in a manner that is not overtly improper, unfair and illegal, and that all material information concerning the Proposed Transaction is disclosed to the UQM's stockholder's so that

4

they are able to make informed decisions as to whether to vote in favor or against the Proposed

Transaction or to seek appraisal of their shares.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges

violations of Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive

one to confer jurisdiction on a court of the United States, which it would not otherwise have.

13.     Personal jurisdiction exists over each defendant either because the defendant

conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over defendant by this Court permissible under

traditional notions of fair play and substantial justice.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391, because UQM's

principal place of business is located in the District of Colorado, and each of the Individual

Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23,

individually and on behalf of the stockholders of UQM common stock who are being and will be

harmed by Defendants' actions described herein (the "Class").  The Class specifically excludes

Defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated

with, any of the Defendants.

16.     This action is properly maintainable as a class action because:

a. The Class is so numerous that joinder of all members is impracticable. According to the Preliminary Proxy, as of February 8, 2019, there were more than 60 million common shares of UQM outstanding. The actual number of public stockholders of UQM will be ascertained through discovery;

b. There are questions of law and fact which are common to the Class, including *inter alia*, the following:

  i. Whether Defendants have violated the federal securities laws;

  ii. Whether Defendants made material misrepresentations and/or omitted material facts in the proxy statement; and

  iii. Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Proposed Transaction is consummated.

c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

  f. Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

17. Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

18. By reason of the Individual Defendants' positions with the Company as officers and/or directors, said individuals are in a fiduciary relationship with UQM and owe the Company the duties of due care, loyalty, and good faith.

19. By virtue of their positions as directors and/or officers of UQM, the Individual Defendants, at all relevant times, had the power to control and influence, and did control and influence and cause UQM to engage in the practices complained of herein.

20. Each of the Individual Defendants are required to act with due care, loyalty, good faith and in the best interests of the Company.  To diligently comply with these duties, directors of a corporation must:

  a. act with the requisite diligence and due care that is reasonable under the circumstances;

  b. act in the best interest of the company;

  c. use reasonable means to obtain material information relating to a given action or decision;

d. refrain from acts involving conflicts of interest between the fulfillment of their roles in the company and the fulfillment of any other roles or their personal affairs;

e. avoid competing against the company or exploiting any business opportunities of the company for their own benefit, or the benefit of others; and

f. disclose to the Company all information and documents relating to the company's affairs that they received by virtue of their positions in the company.

21. In accordance with their duties of loyalty and good faith, the Individual Defendants, as directors and/or officers of UQM, are obligated to refrain from:

a. participating in any transaction where the directors' or officers' loyalties are divided;

b. participating in any transaction where the directors or officers are entitled to receive personal financial benefit not equally shared by the Company or its public shareholders; and/or

c. unjustly enriching themselves at the expense or to the detriment of the Company or its shareholders.

22. Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are violating, the fiduciary duties they owe to UQM, Plaintiff and the other public shareholders of UQM, including their duties of loyalty, good faith, and due care.

23.    As a result of the Individual Defendants' divided loyalties, Plaintiff and Class members will not receive adequate, fair or maximum value for their UQM common stock in the Proposed Transaction.

## PARTIES

24.    Plaintiff Dale Carter is a citizen of the United States and a resident of California. He has been and continues to be a stockholder of UQM during all relevant times thereto.

25.    Defendant UQM together with its subsidiaries, develops, manufactures, and sells electric motors, generators, power electronic controllers, and fuel cell compressors in the United states and internationally.  UQM is a Colorado corporation with its headquarters located at 4120 Specialty Place, Longmont, Colorado 80504.  The Company's common stock is traded on the New York Stock American Exchange ("NYSE American") under the symbol "UQM."  As of October 29, 2018, the Company had 54,253,731 shares of common stock outstanding.

26.    Defendant Donald W. Vanlandingham ("Vanlandingham") has served on the UQM Board of Directors at all relevant times.  In addition, Vanlandingham serves as Chairman of the Board.

27.    Defendant Joe Mitchell ("Mitchell") has served on the UQM Board of Directors at all relevant times.  In addition, Mitchell serves as the Company's President and Chief Executive Officer.

28.    Defendant Stephen J. Roy ("Roy") has served on the UQM Board of Directors at all relevant times.

29.    Defendant Joseph P. Sellinger ("Sellinger") has served on the UQM Board of Directors at all relevant times.

30.    Defendant John E. Sztykiel ("Sztykiel") has served on the UQM Board of Directors at all relevant times.

31.     The Defendants named in paragraphs 26-30 are referred to herein as "Individual Defendants" or "Director Defendants."

32.     The Director Defendants owe fiduciary duties including good faith, loyalty, fair dealing, due care and candor to UQM and its stockholders.

33.     By reason of their positions as officers and/or directors of the Company, the Individual Defendants named above are in a fiduciary relationship with Plaintiff and the other public stockholders of UQM and owe them the highest duties of good faith, loyalty and due care, as set forth in further detail herein.

34.     The Director Defendants, by reason of their corporate directorships and/or executive positions, are fiduciaries to and for the Company's stockholders, which fiduciary relationship required them to exercise their best judgment, and to act in a prudent manner and in the best interests of the company's stockholders.

35.     Each Director Defendant herein is sued individually, as a conspirator and aider and abettor, as well as in their capacity as an officer and/or director of the Company, and the liability of each arises from the fact that he or she has engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

36.     Non-Party Danfoss A/S provides engineering solutions worldwide.  Danfoss A/S is a Danish company with a principal place of business at Nordborgvej 91, Nordborg, 6430, Denmark.

37.     Non-Party Parent is a wholly-owned subsidiary of Danfoss A/S and was created to consummate the Proposed Transaction

38.     Merger Sub Inc. is wholly-owned subsidiary of Parent and was created to consummate the Proposed Transaction.

## SUBSTANTIVE ALLEGATIONS

*Company Background*

39.     UQM operates together with its subsidiaries, develops, manufactures, and sells electric motors, generators, power electronic controllers, and fuel cell compressors in the United states and internationally.

40.     The company offers propulsion motors and generators, auxiliary motors, and electronic controls and DC-to-DC converters for electric, hybrid electric, plug-in hybrid electric, and fuel cell applications.

41.     The Company also provides research, development, and application engineering contract services.

42.     UQM also sells its products to original equipment manufacturers (OEMs), tier 1 suppliers of OEMs, and vehicle integrators in various markets, including passenger buses, mining vehicles, marine, military, aircraft HVAC, airplane tugs, automobiles, and other markets, as well as commercial trucks, vans, and shuttles.

43.     UQM has a demonstrated history of financial success, recently evidenced by its Q3 2018 financials, which were released on October 31, 2018.  Notably, the Company saw an increase in revenue of 59% year-on-year, and reported other positive results, such as an increase of $3 million in orders to China.

44.     Speaking on these positive results, Defendant and Company CEO Mitchell noted, "UQM marked another quarter of strong top line growth and new purchase orders."

45.     Mitchell further expounded on the Company's strong position and optimistic future outlook by stating "Revenue rose nearly 60% year-over-year – underscoring robust demand – while lower margins reflected product mix and ongoing business investment."

46.     For UQM, financial success is not a recent state of affairs, rather the Company has posted strong financials for some time, demonstrating a history of success.  For example, on August 1, 2018, the Company released its Q2 financials for the 2018 year.  Notably, the Company a 51% increase in revenue year-on-year.

47.     Speaking on these positive results, Defendant Mitchell stated, "Our plant is the busiest it has been in years, and 2018 is shaping up to be a very strong growth year for us.  We are very excited about the business and the market opportunities in general for electric vehicle propulsion systems and the role UQM is playing in this growth."

48.     It is clear that UQM, which has shown consistent profitable financial results in its recent financial results is a strong Company poised to continue its solid performance in the future.  However, should the Proposed Transaction be consummated, Plaintiff and all other public stockholders of the Company will be forever foreclosed from benefiting on the future of the Company they invested in.

***The Insufficient Process Leading to the Proposed Transaction***

49.     As detailed in the Preliminary Proxy, the process deployed by the Individual Defendants was flawed and inadequate, was conducted out of the self-interest of the Individual Defendants, and was designed with only one concern in mind – to effectuate a sale of the Company to any strategic partner willing to purchase UQM.

50.     First, the Preliminary Proxy indicates that the Company made the concrete decision to sell UQM to strategic purchaser as early as 2011, and describes such action as necessary in order for UQM to "survive and thrive."  Despite such a grave determination, UQM was clearly able to "survive and thrive" as a standalone entity for the intervening eight-to-nine year period up until the Proposed Transaction was entered into.  Despite such a gap in logic and reasoning, the

Preliminary Proxy makes no mention if the Board's 2011 determination regarding a sale of UQM was ever reconsidered or revisited given the extremely long intervening time period, and if so, the specific nature of such discussions.

51.     The end-goal of a sale of UQM, any sale at all, was such an overriding concern for the Individual Defendants that they entered into a 15-day exclusivity period with Danfoss before the latter even offered an indication of interest containing pricing terms.

52.     This reckless pursuit of any sale also lead the UQM Board into the 2017 attempted sale of the Company to the Chinese Company National Heavy Duty Truck Group Co. Ltd. ("CNHTC") through its wholly owned subsidiary Sinotruk (BVI) Limited (collectively, with CNHTC, "Sinotruk"), which resulted in the Company selling a 9.9% interest in UQM to Sinotruk before the deal was eventually terminated due to regulatory hurdles that could not be overcome. In addition to the money wasted on this fruitless expenditure, it was later revealed to UQM that Sinotruk's projected sales were lower than those initially projected, resulting in further waste. Despite what can only be described as a massive blunder, the Preliminary Proxy is silent as to why the Board failed to properly prevent such waste of Company assets.

53.     The "Special Committee" created by the Board to run the sales process was also clearly tainted by this overriding interest from its inception in 2013. Moreover, the Preliminary Proxy does not mention if the directors that made up the Special Committee were the same throughout its multi-year existence, and if not, the other Directors that sat on the Special Committee before the final iteration took place.

54.     Moreover, the Preliminary Proxy's description of the composition of the final iteration of the Special Committee necessarily raises questions regarding its independence, as it was composed of at least one non-independent director, Defendant Vanlandingham who is

13

Chairman of the Company Board. Moreover, the Preliminary Proxy admits that the other Board members participated in the Special Committees meetings, but gives no specifics as to the identity of the other Directors present at such meetings, or the nature of the conversations that occurred.

55.     Furthermore, regarding the Special Committee, the Preliminary Proxy is unclear regarding what specific powers it possessed, and if any potential transaction required approval of the Special Committee before being voted upon by the full Board.

56.     Moreover, the Preliminary Proxy fails to indicate if the Individual Defendants attempted to negotiate with Danfoss for further employment for Company insiders during the sales process, and at what point. Clearly, such prioritization of their own self-interests is relevant information necessary for Plaintiff and other public stockholders of UQM to gauge the fairness of the sales process leading to the Proposed Transaction.

57.     Finally, the Preliminary Proxy is unclear as to the nature of specific confidentiality and/or non-disclosure agreements UQM entered into with Danfoss and any other potentially interested third party throughout the sales process, if any such agreements were different from one another, the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in those agreements, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid.

58.     It is not surprising, given this background to the overall sales process, that it was conducted in a completely inappropriate and misleading manner.

***The Proposed Transaction***

59.     On January 21, 2019, UQM issued a press release announcing it had entered into a definitive merger agreement under which the Danfoss will acquire the Company in the Proposed

14

Transaction with total equity value of approximately $100 million.  The press release stated in

relevant part:

> **LONGMONT, COLORADO, JANUARY 21, 2019** — UQM Technologies, Inc.
> (NYSE American: UQM) ("UQM" or the "Company"), a developer of alternative
> energy technologies, today announced that it has entered into a definitive merger
> agreement with the Danfoss Power Solutions (US) Company, a wholly-owned
> subsidiary of Denmark-based Danfoss A/S ("Danfoss"), under which Danfoss will
> acquire all outstanding common shares of UQM for $1.71 per share in an all-cash
> transaction valued at approximately $100 million, including the assumption of
> UQM's debt. Danfoss, a privately-owned multinational company with reported
> sales of €5.8 billion in 2017 (2018 full year results to be released on February 28),
> is a leading manufacturer of hydraulic systems, drives, motors, and components for
> the automotive, aerospace, HVAC, and energy industries.  The merger anticipates
> that UQM will become part of the Danfoss Power Solutions segment.
>
> The cash consideration represents a premium of approximately 52.5% over UQM's
> closing share price on January 18, 2019 and a 71.4% premium to its weighted
> average trading price over the trailing 60 days.  The transaction will be funded with
> Danfoss' cash on hand and is not subject to any financing condition.  The merger
> agreement was unanimously agreed to by the Boards of Directors of both UQM and
> Danfoss; GDG Green Dolphin, LLC — which holds approximately 7.4% of the
> issued and outstanding shares of UQM — and all UQM directors and officers have
> executed Voting and Support Agreements in favor of the acquisition.  Closing of
> the transaction is subject to approval by two-thirds of UQM shareholders and by
> the Committee on Foreign Investment in the United States ("CFIUS") as well as
> other customary closing conditions.
>
> Joe Mitchell, UQM Technologies' President and Chief Executive Officer, stated,
> "We believe UQM will be an excellent addition to Danfoss as our products,
> business model, strategy and focus are closely aligned.  Being part of a larger global
> enterprise will greatly improve our position to compete with other international
> players, open doors to new markets, and provide critical resources for UQM to
> continue developing the highly-engineered electric propulsion products we're
> known for today. We believe the transaction positions UQM well for the future —
> particularly in key geographies such as China and India, where Danfoss already
> operates — and provides an attractive return for our shareholders.  We're proud of
> our many accomplishments and look forward to a future with Danfoss, with which
> we can enhance service for our customers, invest in technology, and adapt to the
> ever-changing dynamics of our core markets."
>
> Kim Fausing, President & CEO of Danfoss, added, "It is a great pleasure to
> announce this transaction with UQM, which will position Danfoss for even stronger
> performance in the industries we serve. We see fast-growing demand for electric
> solutions within buses and trucks, off-highway vehicles, and marine markets in

response to the more stringent emission regulations being imposed — stimulating interest in the efficiency and productivity gains our solutions bring. With an established North American presence, UQM will complement our global sales and manufacturing footprint nicely, further cementing our strong position in the marine as well as on- and off-highway markets. I look forward to welcoming the UQM team to Danfoss and our business."

The transaction is expected to close in the second quarter of 2019, subject to approval by UQM's shareholders and CFIUS.

### The Inadequate Merger Consideration

60.     Significantly, analyst expectations, the Company's strong market position, extraordinary growth, positive future outlook and synergistic benefits to Danfoss, establish the inadequacy of the merger consideration.

61.     The compensation afforded under the Proposed Transaction to Company stockholders significantly undervalues the Company. Pursuant to the terms of the Merger Agreement, the transaction values Company stock at $1.71 per share. However, this valuation does not adequately take into consideration how the Company is performing, considering key financial improvements and increases in the cash position of the Company in recent years.

62.     Moreover, financial analysts at HC Wainwright have valued the Company as high as $2.50 per share as recently as the beginning of January 2019, *a value that is more than 46.19% greater than that offered in the Proposed Transaction*.

63.     Additionally, UQM's future success is extremely likely, given the consistent positive financial results it has posted over the past several quarters. Obviously, the opportunity to invest in such a company on the rise is a great coup for Danfoss, however it undercuts the investment of Plaintiff and all other public stockholders.

64.     Finally, the synergistic value of UQM to Danfoss is most illustrative of the inadequacy of the Merger consideration. For example, commenting on the Proposed Transaction, Kim Fausing, President & CEO of Danfoss stated, "It is a great pleasure to announce this

transaction with UQM, which will position Danfoss for even stronger performance in the industries we serve."

65.    Furthermore, Defendant Mitchell also commented on the synergistic benefits of the deal to Danfoss, stating "We believe UQM will be an excellent addition to Danfoss as our products, business model, strategy and focus are closely aligned."

66.    Clearly, while the deal will be beneficial to Danfoss it comes at great expense to Plaintiff and other public stockholders of the Company.

67.    Moreover, post-closure, UQM stockholders will be frozen out of ownership interest in the surviving company, removing any future benefit from their investment in UQM.

68.    It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for Danfoss at the expense of UQM stockholders, which clearly indicates that UQM stockholders were not an overriding concern in the formation of the Proposed Transaction.

***Preclusive Deal Protection Mechanisms***

69.    The Merger Agreement contains certain provisions that unduly benefit Danfoss by making an alternative transaction either prohibitively expensive or otherwise impossible.  For example, the Merger Agreement contains a termination fee provision that requires UQM to pay up to $3,500,000 to Danfoss in fees and expenses if the Merger Agreement is terminated under certain circumstances.

70.    The termination fee payable under this provision will make the Company that much more expensive to acquire for potential purchasers, while resulting in a corresponding decline in the amount of consideration payable to UQM's stockholders.

71.     The Merger Agreement also contains a "no solicitation" provision that restricts UQM from considering alternative acquisition proposals by, *inter alia*, constraining UQM's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the provision prohibits the Company from soliciting any alternative proposal, but permits the Board to consider a "*bona fide*, unsolicited written Takeover Proposal" if it constitutes or is reasonably calculated to lead to a "*Superior Proposal*" as defined in the Merger Agreement.

72.     Moreover, the Agreement further reduces the possibility of a topping offer from an unsolicited purchaser.  Here, Defendants agreed to provide Danfoss information in order to match any other offer, thus providing Danfoss access to the unsolicited bidder's financial information and giving Danfoss the ability to top the superior offer.  Thus, a rival bidder is not likely to emerge with the cards stacked so much in favor of Danfoss.

73.     These provisions, individually and collectively, materially and improperly impede the Board's ability to fulfill its fiduciary duties with respect to fully and fairly investigating and pursuing other reasonable and more valuable proposals and alternatives in the best interests of the Company and its public stockholders.

74.     Finally, all directors and executive of UQM, who collectively hold 3.55% of the issued and outstanding shares of the Company, as well as GDG Green Dolphin, LLC, which holds 7.4% of the issued and outstanding shares of UQM, have entered into voting agreements with Danfoss locking up their shares in favor of the Proposed Transaction and making any third party bid that much more unlikely to be successful.

75.     Accordingly, the Company's true value is compromised by the consideration offered in the Proposed Transaction.

**Potential Conflicts of Interest**

76.    The breakdown of the benefits of the deal indicate that UQM insiders are the primary beneficiaries of the Proposed Transaction, not the Company's public stockholders.  The Board and the Company's executive officers are conflicted because they will have secured unique benefits for themselves from the Proposed Transaction not available to Plaintiff and the public stockholders of UQM.

77.    Certain insiders stand to receive massive financial benefits as a result of the Proposed Transaction.  Notably, Company insiders, including the Individual Defendants, currently own large, illiquid portions of Company stock that will be exchanged for large cash pay days upon the consummation of the Proposed Transaction.

78.    Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement.   Furthermore, upon the consummation of the Proposed Transaction, each outstanding Company option or equity award, will be canceled and converted into the right to receive certain consideration according to the merger agreement.

79.    Notably, Company Director and other insiders will receive compensation under the Proposed Transaction in exchange for their illiquid blocks of stock and equity awards as per the following schedule:

| Name | Number of Company Shares Subject to Options | Total Consideration for Options | | Number of Shares of Unvested Restricted Stock | Total Consideration for Unvested Restricted Stock | | Aggregate Consideration for Equity Awards | |
|---|---|---|---|---|---|---|---|---|
| Joseph R. Mitchell | 766,872 | $ | 560,987 | 69,831 | $ | 119,411 | $ | 680,398 |
| David I. Rosenthal | 441,147 | $ | 318,994 | 33,770 | $ | 57,747 | $ | 376,741 |
| Adrian P. Schaffer | 391,250 | $ | 285,166 | 26,515 | $ | 45,341 | $ | 330,507 |
| Josh M. Ley | 283,378 | $ | 205,517 | 20,308 | $ | 34,727 | $ | 240,244 |

| Name | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Donald W. Vanlandingham | 106,966 | $ | 73,379 | — | $ | — | $ | 73,379 |
| Stephen J. Roy | 140,382 | $ | 107,829 | — | $ | — | $ | 107,829 |
| Joseph P. Sellinger | 118,346 | $ | 60,706 | — | $ | — | $ | 60,706 |
| John E. Sztykiel | 89,162 | $ | 60,706 | — | $ | — | $ | 60,706 |

80.     Moreover, certain employment agreements with certain UQM executives, entitle such executives to severance packages should their employment be terminated under certain circumstances. These 'golden parachute' packages are significant, and will grant each director or officer entitled to them millions of dollars, compensation not shared by UQM common stockholders, as follows:

81.

| Name | Cash ($)(1) | Unvested Restricted Shares ($)(2) | Unvested Options ($)(3) | Benefits ($)(4) | Total ($) |
|---|---|---|---|---|---|
| Joseph R. Mitchell | 839,264 | 119,411 | 289,876 | 8,156 | 1,256,708 |
| David I. Rosenthal | 183,305 | 57,747 | 140,823 | 8,058 | 389,933 |
| Adrian P. Schaffer | 166,777 | 45,341 | 104,544 | 5,624 | 322,285 |

82.     Additionally, as per the Preliminary Proxy, the current management team of UQM, including CEO Director Defendant Mitchell, will continue in their role with the surviving entity. These lucrative employment agreements including consideration not shared with Plaintiff and other members of the Class.

83.     Moreover, Duff & Phelps, the Company's financial advisor, had previously acted as financial advisor, and received compensation for such services, in relation to the Company's failed attempt to sell itself to Chinese company Hybrid Kinetic Group Limited ("Hybrid Kinetic"), which was ultimately voted down by UQM stockholders and terminated. However, the Preliminary Proxy does not provide the actual amount of compensation given to Duff & Phelps by the Company for this service, nor if its engagement was based upon a contingency related to the consummation of the Hybrid Kinetic merger, rather the Preliminary Proxy indicates only that Duff

& Phelps received, "customary fees, expense reimbursement, and indemnification" for its role as financial advisor relating to the failed Hybrid Kinetic deal. More specific information regarding the nature and specific amount of this prior fee from the Company to Duff & Phelps is important for Plaintiff and other public stockholders of UQM to gauge the fairness of the sales process leading to the Proposed Transaction.

84.    Thus, while the Proposed Transaction is not in the best interests of UQM stockholders, it will produce lucrative benefits for the Company's officers and directors.

**_The Materially Misleading and/or Incomplete Preliminary Proxy_**

85.    On February 12, 2019, the Board and UQM caused to be filed with the SEC a materially misleading and incomplete Preliminary Proxy that, in violation their fiduciary duties, failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Transaction.

_Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Transaction_

86.    Specifically, the Preliminary Proxy fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Transaction. In particular, the Preliminary Proxy fails to disclose:

> a.    Whether the Company Board's 2011 determination regarding a sale of UQM was ever reconsidered or revisited given the extremely long intervening time period, and if so, the specific nature of such discussions;

b.  The specific reasoning as to the decision to enter into a 15-day exclusivity period with Danfoss before Danfoss offered an indication of interest containing pricing terms;

c.  Whether Sinotruk played any role in the Board's decision making process leading up to the Board's decision to enter into the Proposed Transaction given that Sinotruk holds 9.9% of UQM's outstanding stock;

d.  Whether the directors that made up the Special Committee were the same throughout its multi-year existence, and if not, the other Directors that sat on the Special Committee before the final iteration took place;

e.  The specific reasoning as to why non-independent director, Defendant Vanlandingham who is Chairman of the Company Board, was placed on the Special Committee;

f.  The specific powers the Special Committee possessed, and if any potential transaction required approval of the Special Committee before being voted upon by the full Board;

g.  Any communications regarding post-transaction employment during the negotiation of the underlying transaction must be disclosed to stockholders. This information is necessary for stockholders to understand potential conflicts of interest of management and the Board, as that information provides illumination concerning motivations that would prevent fiduciaries from acting solely in the best interests of the Company's stockholders; and

h.  The actual and specific amount of compensation that Duff & Phelps received for its role as financial advisor relating to the failed Hybrid Kinetic deal, and if

any of the compensation (received or not received) was structured as contingent upon the Hybrid Kinetic deal's consummation; and

i.   The nature of specific confidentiality and/or non-disclosure agreements UQM entered into with Danfoss and any other third parties throughout the sales process, if any such agreements were different from one another, the terms of any included "don't-ask, don't-waive" provisions or standstill provisions in those agreements, and if so, the specific conditions, if any, under which such provisions would fall away or prevent parties from submitting a bid.

*Omissions and/or Material Misrepresentations Concerning UQM's Financial Projections*

87.    The Preliminary Proxy fails to provide material information concerning financial projections provided by UQM's management and relied upon by Duff & Phelps in its analyses. The Preliminary Proxy fails to disclose and/or discloses management-prepared financial projections for the Company which are materially misleading.  The Preliminary Proxy indicates that in connection with the rendering of Duff & Phelps' fairness opinion, Duff & Phelps reviewed "Other internal documents relating to the history, current operations, and probable future outlook of the Company, including financial projections for the Company, provided to Duff & Phelps by the Company's management (the "Management Projections")"  Accordingly, the Preliminary Proxy should have, but fails to provide, certain information related to the Management Projections provided by UQM management to the Board and Duff & Phelps.  Courts have uniformly stated that "projections … are probably among the most highly-prized disclosures by investors.  Investors can come up with their own estimates of discount rates or [] market multiples.  What they cannot hope to do is replicate management's inside view of the company's prospects."  *In re Netsmart Techs., Inc. S'holders Litig.*, 924 A.2d 171, 201-203 (Del. Ch. 2007).

88.     Specifically, despite the Preliminary Proxy indicating that Duff & Phelps was provided with UQM's Management Projections, and that they were relied upon in performing its financial analyses, ***the Preliminary Proxy provides no information whatsoever regarding the UQM's Management Projections***.

89.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to Defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process.

90.     Without accurate projection data presented in the Preliminary Proxy, Plaintiff and other stockholders of UQM are unable to properly evaluate the Company's true worth, the accuracy of Duff & Phelps' financial analyses, or make an informed decision whether to vote their Company stock in favor of the Proposed Transaction.  As such, the Board has breached their fiduciary duties by failing to include such information in the Preliminary Proxy.

*Omissions and/or Material Misrepresentations Concerning the Financial Analyses by Duff & Phelps*

91.     In the Preliminary Proxy, Duff & Phelps describes its fairness opinion and the various valuation analyses performed to render such opinion.  However, the descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinions.

92.     With respect to the *Discounted Cash Flow Analysis*, the Preliminary Proxy fails to disclose the following:

a.  The specific inputs and assumptions used to calculate the terminal growth rate of 3.0%; and

b.  The specific inputs and assumptions used to calculate the discount rate range of 30.0%-35.0% for the "High-Growth Stage" analysis;

c.  The specific inputs and assumptions used to calculate the discount rate range of 20.0%-25.0% for the "Stable-Growth Stage" analysis;

d.  The specific inputs and assumptions used to calculate the discount rate range of for the "Normalized-Growth Stage" analysis, as well as the actual discount rate used; and

e.  The valuation range for UQM on a per-share or aggregate basis in any of the three individual DCF analyses performed (i.e. "High-Growth", "Stable-Growth", or "Normalized-Growth") which portend to make up the overall estimated enterprise value of the Company of approximately $75.6 million to approximately $102.0 million.

93.    With respect to the *Selected Public Companies Comparable Analysis*, the Preliminary Proxy fails to disclose the following:

a.  The actual multiples calculated for each compared company, on an individual basis;

b.  The actual multiples calculated for the Company; and

c.  The valuation range for UQM on a per-share or aggregate basis derived from the *Selected Public Companies Comparable Analysis*.

94.    With respect to the *Selected Mergers and Acquisitions Transactions Analysis*, the Preliminary Proxy fails to disclose the following:

a.   The total value of each of the selected transactions;

b.   The specific date on which each selected transaction closed;

c.   The per share value of each selected transaction;

d.   The actual multiples calculated for each selected transaction, on an individual

basis; and

e.   The valuation range for UQM on a per-share or aggregate basis derived from

the *Selected Mergers and Acquisitions Transactions Analysis*.

95.    Additionally Duff & Phelps' calculated an overall enterprise value range of UQM

that did "not include the selected public companies analysis or the selected mergers and

acquisitions transactions analysis", and rather solely based on the DCF analysis.  Such an out of

the ordinary aggregate analytical approach further begs the question as to what the result the

Selected Companies and Selected Transactions analyses were.

96.    These disclosures are critical for stockholders to be able to make an informed

decision on whether to vote their shares in favor of the Proposed Transaction.

97.    Without the omitted information identified above, UQM's public stockholders are

missing critical information necessary to evaluate whether the proposed consideration truly

maximizes stockholder value and serves their interests.  Moreover, without the key financial

information and related disclosures, UQM's public stockholders cannot gauge the reliability of the

fairness opinion and the Board's determination that the Proposed Transaction is in their best

interests.  As such, the Board has breached their fiduciary duties by failing to include such

information in the Preliminary Proxy.

# FIRST COUNT

## Claim for Breach of Fiduciary Duties

## (Against the Individual Defendants)

98.    Plaintiff repeats all previous allegations as if set forth in full herein.

99.    The Individual Defendants have violated their fiduciary duties of care, loyalty and good faith owed to Plaintiff and the Company's public stockholders.

100.    By the acts, transactions and courses of conduct alleged herein, Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and other members of the Class of the true value of their investment in UQM.

101.    As demonstrated by the allegations above, the Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith owed to the stockholders of UQM by entering into the Proposed Transaction through a flawed and unfair process and failing to take steps to maximize the value of UQM to its public stockholders.

102.    Indeed, Defendants have accepted an offer to sell UQM at a price that fails to reflect the true value of the Company, thus depriving stockholders of the reasonable, fair and adequate value of their shares.

103.    Moreover, the Individual Defendants breached their duty of due care and candor by failing to disclose to Plaintiff and the Class all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Proposed Transaction.

104.    The Individual Defendants dominate and control the business and corporate affairs of UQM, and are in possession of private corporate information concerning UQM's assets, business and future prospects.  Thus, there exists an imbalance and disparity of knowledge and

economic power between them and the public stockholders of UQM which makes it inherently unfair for them to benefit their own interests to the exclusion of maximizing stockholder value.

105.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise due care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other members of the Class.

106.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of UQM's assets and have been and will be prevented from obtaining a fair price for their common stock.

107.    Unless the Individual Defendants are enjoined by the Court, they will continue to breach their fiduciary duties owed to Plaintiff and the members of the Class, all to the irreparable harm of the Class.

108.    Plaintiff and the members of the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which Defendants' actions threaten to inflict.

## SECOND COUNT

### Aiding and Abetting the Board's Breaches of Fiduciary Duty

### Against Defendant UQM Technologies, Inc.

109.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

110.     Defendant UQM knowingly assisted the Individual Defendants' breaches of fiduciary duty in connection with the Proposed Transaction, which, without such aid, would not have occurred.

111.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

112.     As a result of this conduct, Plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining a fair price for their shares.

**THIRD COUNT**

**Violations of Section 14(a) of the Exchange Act**

**<u>(Against All Defendants)</u>**

113.     Plaintiff repeats all previous allegations as if set forth in full herein.

114.     Defendants have disseminated the Preliminary Proxy with the intention of soliciting stockholders to vote their shares in favor of the Proposed Transaction.

115.     Section 14(a) of the Exchange Act requires full and fair disclosure in connection with the Proposed Transaction.  Specifically, Section 14(a) provides that:

> It shall be unlawful for any person, by the use of the mails or by any means or
> instrumentality of interstate commerce or of any facility of a national securities
> exchange or otherwise, in contravention of such rules and regulations as the [SEC]
> may prescribe as necessary or appropriate in the public interest or for the protection
> of investors, to solicit or to permit the use of his name to solicit any proxy or consent

or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

116.    As such, SEC Rule 14a-9, 17 C.F.R. 240.14a-9, states the following:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

117.    The Preliminary Proxy was prepared in violation of Section 14(a) because it is materially misleading in numerous respects and omits material facts, including those set forth above.  Moreover, in the exercise of reasonable care, Defendants knew or should have known that the Preliminary Proxy is materially misleading and omits material facts that are necessary to render them non-misleading.

118.    The Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

119.    The Defendants were at least negligent in filing a Preliminary Proxy that was materially misleading and/or omitted material facts necessary to make the Preliminary Proxy not misleading.

120.    The misrepresentations and omissions in the Preliminary Proxy are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of its entitlement to decide

whether to vote its shares in favor of the Proposed Transaction on the basis of complete information if such misrepresentations and omissions are not corrected prior to the stockholder vote regarding the Proposed Transaction.

## FOURTH COUNT

### Violations of Section 20(a) of the Exchange Act

### (Against All Individual Defendants)

121.    Plaintiff repeats all previous allegations as if set forth in full herein.

122.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or should have known that the Preliminary Proxy was materially misleading to Company stockholders.

123.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein.  The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the Preliminary Proxy and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws.  The Individual Defendants were able to, and did, control the contents of the Preliminary Proxy.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed the Preliminary Proxy before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

124.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of UQM's business, the information contained in its filings with the SEC, and its public statements.  Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the Preliminary Proxy was misleading.  As a result, the Individual Defendants are responsible for the accuracy of the Preliminary Proxy and are therefore responsible and liable for the misrepresentations contained herein.

125.    The Individual Defendants acted as controlling persons of UQM within the meaning of Section 20(a) of the Exchange Act.  By reason of their position with the Company, the Individual Defendants had the power and authority to cause UQM to engage in the wrongful conduct complained of herein.  The Individual Defendants controlled UQM and all of its employees.  As alleged above, UQM is a primary violator of Section 14 of the Exchange Act and SEC Rule 14a-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

(a)    Declaring that this action is properly maintainable as a class action, certifying Plaintiff as Class representative and certifying his counsel as class counsel;

(b)    Declaring and decreeing that the Proposed Transaction was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable, and rescinding and invalidating any merger agreement or other agreements that Defendants entered into in connection with, or in furtherance of, the Proposed Transaction;

(c)    Preliminarily and permanently enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction;

(d)    Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction that is in the best interests of UQM's stockholders;

(e)    Imposing a constructive trust, in favor of Plaintiff and the Class, upon any benefits improperly received by Defendants as a result of their wrongful conduct;

(f)    Awarding Plaintiff, the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

(g)    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury of all claims so triable.

Dated: February 20, 2019                    **BRODSKY & SMITH, LLC**

By:    */s/ Marc L. Ackerman*
            Marc L. Ackerman
            Two Bala Plaza, Suite 510
            Bala Cynwyd, PA 19004
            Phone: (610) 667-6200
            Fax:    (610) 667-9029
            Email: mackerman@brodskysmith.com

            *Counsel for Plaintiff*